Matthew M. Loker, Esq. (Cal. Bar No. 279939)
LOKER LAW, APC
1303 East Grand Avenue, Suite 101
Arroyo Grande, CA 93420
Telephone: (805) 994-0177
matt@lokerlaw.com

SaraEllen Hutchison (WA State Bar No. 36137;
*Pro Hac Vice* to be requested)
Law Office of SaraEllen Hutchison, PLLC
2367 Tacoma Avenue South
Tacoma, WA 98402
Telephone: (206) 529-5195
Facsimile: (253) 302-8486
E-mail: saraellen@saraellenhutchison.com

*Attorneys for Plaintiff,*
Shauna Baker

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAUNA BAKER, | NO. |
| Plaintiff, | **COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:** |
| v. | |
| GROWTH CAVE, LLC, THREAD BANK, FINMKT, INC., FUND MY CONTRACT, LLC, GNOSIS LABS, INC. DBA WIZEBANK NA AKA ELECTIVE, UNIVERSAL FINANCE, INC. DBA UGA FINANCE, LUCAS LEE-TYSON, AND OSMANY BATTE AKA "OZZIE BLESSED," | (1) **THE FAIR CREDIT REPORTING ACT;** (2) **INTER ALIA** |
| | **JURY TRIAL DEMANDED** |
| Defendants. | |

## **INTRODUCTION**

1. In 1914, when drafting the Federal Trade Commission Act, Congress said: "It is impossible to frame definitions which embrace all unfair practices. There is no limit to human inventiveness in this field. Even if all known unfair practices were specifically defined and prohibited, it would be at once necessary to begin over again. If Congress were to adopt the method of definition, it would undertake an endless task." H. R. Conf. Rep. No. 1142, 63d Cong., 2d Sess., 19 (1914).

2. Defendants are social media influencers and consumer lending entities capitalizing on one of the biggest threats to American consumers in the 2020s: "coaching" scams. "Coaching" refers to a broad category of service businesses that may refer to personal support or business motivation, such as life coaching or a program on how to start an online business.

3. A "coaching" *scam* involves a social media influencer who capitalizes on the number of his followers or reach to promote the influencer's online "coaching" program that purports to teach consumers how to earn substantial income online, but the income claims are unsubstantiated or fabricated, and frequently instruct consumers to make false or misleading claims in the consumers' online marketing of their own coaching courses. Coaching scams employ high-pressure sales tactics to coerce consumers into paying thousands or tens of thousands of dollars for the purported "coaching" programs. Coaching scams also may present themselves as legitimate business opportunities or consultants to lure otherwise discerning consumers.

4. In response to coaching scams, the FTC is considering broadening the Business Opportunity Rule at 16 C.F.R. 437 to cover such "coaching."

5.  Coaching scams that direct consumers to take out high-interest consumer loans to pay for the "coaching" programs are able to charge substantial five-figure sums, higher than the limit of most consumers' credit cards. The financial institutions and financial technology ("fintech") entities earn interest and fees as normal lenders, but are further enriched by the coaching scam's calculated selection and grooming of victims who are unlikely to default on the loans. Defendants, fully aware that their "coaching" and income promises are suspect, and the pseudo-"coaching" carries an unconscionably high price tag in exchange for virtually nothing, are nevertheless eagerly profiting from the coaching scams by offering high-interest loans to consumers.

6.  The United States Congress has found that the banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence, which is essential to the continued functioning of the banking system.  As such, Congress enacted the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA") to insure fair and accurate reporting, promote efficiency in the banking system and protect consumer privacy.

7.  Plaintiff SHAUNA BAKER ("Plaintiff") through Plaintiff's attorneys, bring this lawsuit to challenge the actions of Defendants GROWTH CAVE, LLC ("Growth Cave,") THREAD BANK ("Thread"), FINMKT, INC. ("FinMkt"), FUND MY CONTRACT, LLC ("FMC"), GNOSIS LABS, INC. DBA WIZEBANK NA AKA ELECTIVE ("Wizebank"), UNIVERSAL FINANCE, INC. DBA UGA FINANCE ("UGA"), LUCAS LEE-TYSON ("Lee-Tyson") AND OSMANY BATTE AKA "OZZIE BLESSED" ("Batte"), (collectively, "Defendants") with regard to their fraudulent and

deceptive marketing and financing of illusory "coaching" services, and this conduct caused Plaintiff damages.

8. Plaintiff makes these allegations on information and belief, with the exception of those allegations that pertain to a Plaintiff, or to a Plaintiff's counsel, which Plaintiff alleges on personal knowledge.

9. While many violations are described below with specificity, this Complaint alleges violations of the statutes cited in their entirety.

10. Unless otherwise stated, Plaintiff alleges that any violations by Defendants were knowing and intentional, and that Defendants did not maintain procedures reasonably adapted to avoid any such violation.

11. Unless otherwise indicated, the use of any Defendants' name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, and insurers of that Defendants named.

## **JURISDICTION AND VENUE**

12. Jurisdiction and Venue in the United States District Court, Central District of California, are appropriate where this dispute involves federal law, where acts at issue and described herein occurred in this district, where Defendants are residents of this district, and where the amount in controversy exceeds $75,000 and Plaintiff is a citizen of a different state from any Defendant. 15 U.S.C. §1681; 28 U.S.C. §1391(b); 28 U.S.C. §1331; 28 U.S.C. §1332.

13. Defendants are also liable unto Plaintiff pursuant to the laws of the State of California, which claims may be brought under the Supplemental Jurisdiction of this Court. 28 U.S.C. 1367 et seq.

**PARTIES**

14. Defendant Growth Cave is a Delaware LLC headquartered in California selling "coaching" online in all fifty states and Canada.

15. "Coaching" refers to a broad category of service businesses that may refer to personal or business support, such as life coaching, business coaching or business consulting.

16. Because coaching is not specifically regulated, anyone, regardless of their credentials or intentions, can call themselves a "coach" and sell "coaching" online.

17. Defendants Lee-Tyson and Batte are principals of Growth Cave.

18. Lee-Tyson is a YouTube and Facebook influencer residing in Los Angeles County, California.

19. Batte is a YouTube and Facebook influencer known by his pseudonym, "Ozzie Blessed," and resides in the greater Los Angeles, California metro area.

20. Growth Cave, Lee-Tyson & Batte do business in all 50 states and Canada.

21. Defendant FMC is a Georgia- and California-based business that runs a website, fundmycontract.com, in all 50 states, where consumers can apply for loans.

22. Defendant FinMkt is a New York corporation that arranges loans and performs hard credit inquiries into consumer loan applicants, doing business in all 50 states.

23. Defendant Thread is a nationally-chartered bank based in Tennessee doing business in all 50 states.

24. Defendant Wizebank is a British Columbia-based bank doing business in all

50 states and Canada.

25. Defendant UGA is a Missouri LLC and a consumer loan servicer and debt collector doing business in all 50 states.

26. Plaintiff, Shauna Baker ("Plaintiff") is an individual residing in Ripley, Oklahoma.

27. Plaintiff purchased "coaching" from Growth Cave/Lee-Tyson/Batte doing business as Growth Cave.

28. The Growth Cave/Lee-Tyson/Batte "coaching" was funded by loans originated by Thread and Wizebank.

29. Both the Thread loan and the Wizebank loan stated they were consumer loans.

30. The Thread loan was accessed through FMC's website and arranged by FinMkt.

31. The Thread loan was purportedly purchased by US Credit, not a party to this action.

32. The Thread loan was serviced by UGA, who electronically billed Plaintiff each month.

33. Plaintiff is therefore a "consumer" pursuant the FCRA and California State law and acted as such at all times relevant to this Complaint.

34. Growth Cave, Thread, Wizebank, FMC, Finmkt and UGA are therefore "businesses" pursuant to California Civil Code 1798.80.

35. FinMkt performed the hard inquiry into Plaintiff's credit files for Thread, making FinMkt a "user" pursuant to the FCRA.

36. Wizebank performed the hard inquiry into Plaintiff's credit files for Wizebank, making Wizebank a "user" pursuant to the FCRA.

37. This case involves money, property or their equivalent, due or owing or

alleged to be due or owing from a natural person by reason of a consumer credit transaction.  As such, this action arises out of a "consumer debt" and "consumer credit" as those terms are defined by Cal. Civ. Code § 1788.2(f).

38.  Plaintiff was induced into fraudulent purchases with Growth Cave that were financed with a credit card and loans with Wizebank and Thread, which will cost Plaintiff over $91,000 over the life of the debt.

## **FACTUAL ALLEGATIONS**

39.  At all times relevant, Plaintiff is an individual residing in Oklahoma.

40.  Plaintiff is informed and believes, and thereon alleges, that at all times relevant, Defendants conducted business in the State of California.

41.  Defendants are social media influencers and consumer lending entities capitalizing on one of the biggest threats to American consumers in the 2020s: "coaching" scams.

42.  A coaching scam involves a social media influencer who capitalizes on the number of his followers or reach to promote the influencer's online business "coaching" program that purports to teach consumers how to earn substantial income online, but the income claims are unsubstantiated or fabricated, and frequently instruct consumers themselves to make false or misleading claims in the consumers' own online marketing.

43.  Coaching scams typically employ high-pressure sales tactics to coerce consumers into paying thousands or tens of thousands of dollars for the purported "coaching" programs.

44.  Coaching scams also may present themselves as legitimate business and marketing consultants in order to lure otherwise discerning consumers.

45. Coaching scams that direct consumers to take out high-interest consumer loans to pay for the "coaching" programs are able to charge substantial five-figure sums, higher than the limit of most consumers' credit cards.

46. Plaintiff is a licensed Oklahoma Real Estate Broker and Brokerage Owner.

47. In January 2023, Plaintiff was shown a YouTube advertisement by Growth Cave in which Growth Cave and Lee-Tyson promised to teach Plaintiff all-new secrets to making money online.

48. Growth Cave is the brand and business entity of social media influencers Lee-Tyson and Batte, who publish and advertise content on YouTube and other social media platforms that they are making tens of millions of dollars per year employing a variety of online business strategies, and that their "coaching" programs can help consumers learn how to do the same.

49. Plaintiff, a real estate broker, was looking for a way to make more money during a soft real estate market.

50. Plaintiff was among the kinds of consumers targeted by Growth Cave's, Lee-Tyson's, and Batte's YouTube advertising.

51. Plaintiff was enticed by Growth Cave's, Lee-Tyson's and Batte's video claims of expertise and success making money through YouTube and online generally.

52. Plaintiff was persuaded by Growth Cave, Lee-Tyson and Batte to provide them with her email address to learn more about their "coaching" programs.

53. Growth Cave and Lee-Tyson, aided by Batte, then sent Plaintiff a series of emails designed to persuade consumers like Plaintiff into "jumping on a call," which is online "coaching" scam parlance for having a sales conversation via Zoom with one of the "coach's" agents.

54. Plaintiff was persuaded to "jump on a call" to find out how Growth Cave and Lee-Tyson could help her create the kind of profits they advertised in their videos.

55. The first call between Growth Cave and Plaintiff occurred on January 26, 2023.

56. During this first sales call, Growth Cave, through its agent Boise Le, told Plaintiff that she was a "good fit" for their programs, a tactic to disarm a consumer's natural skepticism.

57. Le told Plaintiff that Growth Cave and Lee-Tyson had a "coaching" program called Knowledge Business Accelerator, or "KBA" for short.

58. The purchase price for KBA was $6,800.

59. Growth Cave, through Le, represented that KBA had a $10,000 per month profit guarantee within 30 days if she financed through Wizebank.

60. Growth Cave, through Le, described Wizebank as Growth Cave's "lending partner."

61. Le told Plaintiff that Plaintiff would be able to pay off the Wizebank loan with the $10K guarantee.

62. Plaintiff was reassured by the $10k guarantee, so she agreed to do the KBA program and use Wizebank to avail herself of the guarantee.

63. Le directed Plaintiff to go to the Wizebank website in order to obtain the Wizebank loan, and Le stayed with Plaintiff on the Zoom call while Plaintiff applied.

64. Plaintiff completed the Wizebank loan over Zoom without benefit of seeing any contract terms with Growth Cave prior to taking out the loan and paying the "coaching" fee.

65. Plaintiff was immediately approved for a loan through Wizebank, while on the call with Le.

66. Wizebank, as "Elective," performed a hard credit inquiry on Plaintiff's credit files.

67. Plaintiff's loan with Wizebank required a down payment that day of $1,360.00 and then 5 monthly payments of $1,088.00 for 5 months at 0% interest.

68. Wizebank specializes in offering point-of-sale loans to "coaches," which it euphemistically calls the "alternative education industry."

69. Wizebank is now doing business as "Elective," and on its website, lists Growth Cave as one of its customers under the name "Growthbox.ai," which is a calendaring software program sold by Growth Cave.

70. Plaintiff ultimately paid the $6,800 Wizebank loan with a credit card.

71. Plaintiff's loan contract with Wizebank failed to include Holder Rule language.

72. In fact, the Wizebank contract states, in pertinent part:

> You acknowledge and agree that Merchant, and not Wizebank, is the provider of the goods and services you are purchasing. If you have any concerns or issues with the goods, you must attempt to resolve the issue with the Merchant. Merchant, and not Wizebank, is responsible for determining whether or not you are entitled to any refund or credit for any goods or services you purchase from Merchant. Wizebank is not responsible for any issues you have with Merchant or liable if Merchant does not give you a refund or credit, imposes any additional charges or takes any other action.

73. The Merchant identified in the contract was Growth Cave.

74. Boise Le also told Plaintiff that Plaintiff would be required to leave a positive review for Growth Cave on Trustpilot, a business review website, before Plaintiff could access the course materials.

75. The KBA "coaching" program consisted primarily of prerecorded videos of Lee-Tyson boasting about the millions of dollars he was making online, and pitching how success was guaranteed to happen faster for consumers if they signed up for one-on-one personal help in a "mastermind" with Growth Cave, Lee-Tyson and Batte that would be "limited" to 25 participants.

76. Plaintiff was confused by the videos, and by the time she was done watching them, had been persuaded, as was intended by Growth Cave, that she needed to join the "mastermind."

77. Meanwhile, Growth Cave and Lee-Tyson were bombarding Plaintiff with multiple emails per week full of tantalizing promises of an automated way to do business online where Plaintiff could achieve "Digital Freedom" and have more time for life outside work.

78. Growth Cave represented that Plaintiff would have to "apply" for the "Digital Freedom Mastermind" and that spaces would be limited to 25 participants.

79. Plaintiff did not know at the time that the initial $6,800 KBA "coaching" program was simply a ploy to get consumers to desire Growth Cave, Lee-Tyson and Batte to "personally" assist the consumer in a costly $50,000 "done for you" program.

80. False statements and claims made by Growth Cave and Lee-Tyson included:
   - Limit of 25 spots per year to ensure all members are getting the personalized 1-on-1 attention they need to succeed.
   - Access to our done-for-you services team to provide you with EVERTHING you could possibly need to run your business FOR YOU so you can focus on what you do best.
   - For ambitious online course creators wanting to make $1M-$10M+/year with their own online course business, making a massive impact on their clients and their industry
   - Do it all without selling your soul and while being authentic to

YOU…
- Work 1-on-1 with Lucas, Ozzie, and the executive team at Growth Cave to build your automated online course business so that it runs like a well-oiled machine.
- It's my cheap as pancakes automated system to making six figures online….all automated
- True, unlimited freedom to do whatever you want, whenever you want…all while money pours into your bank account.
- In fact, it's the exact same system I used to become a multi-millionaire by the time I was 24
- Make business fun and have an amazing lifestyle, not only thinking about business.
- If you have the YouTube app on your phone, you can make life-changing, passive income right now.
- This is an invite-only 1-on-1 program where Lucas and our executive team at Growth Cave can build your online course business FOR you.
- Here's how you can use your phone on the toilet to make $3000-$4000/month sending copy & paste texts.
- If I offered you $3000 a month to do almost no work, would you take it? The best part is that once this system is set up, it runs on autopilot.

81. Plaintiff was deceived by Growth Cave's, Lee-Tyson's and Batte's marketing representations into getting into another sales call with Growth Cave on February 15, 2023.

82. During that second sales call, Growth Cave's salesperson, Matthew Pulliam, represented that Plaintiff would quickly recoup her "investment" with Growth Cave by following Growth Cave's instructions and allowing Growth Cave to do a "done for you" program.

83. Growth Cave, through Pulliam, represented to Plaintiff that the "done for you" program would provide the sales system for Plaintiff, including writing her advertising copy, recording her YouTube video advertisements, and

"automating" her "sales funnel."

84. Pulliam never informed Plaintiff of a "no refund policy."

85. Pulliam also told Plaintiff that Plaintiff was the "first one" Growth Cave had invited to the "Mastermind."

86. Growth Cave, through Pulliam, also guaranteed a 1.25% "Click through rate" or "CTR," a metric used in social media advertising to evaluate the performance of social media marketing ads.

87. Growth Cave represented to Plaintiff that this high-priced "mastermind" program would be limited to 25 participants, so that each participant could get significant substantive one-on-one help from Growth Cave's founders, Lee-Tyson and Batte.

88. Growth Cave represented to Plaintiff that her success would come a lot faster if she joined the "mastermind" program and allowed Growth Cave, Lee-Tyson and Batte to personally help her.

89. Plaintiff did not know then that Growth Cave would not fulfill those promises.

90. Growth Cave, eager to get Plaintiff to pay in full that day, offered Plaintiff a $10,000 discount if she put $10,000 down on a credit card and financed the $30,000 balance to "join the mastermind" and purchase Growth Cave/Lee-Tyson/Batte's "content" and "services."

91. Growth Cave, through Pulliam, directed Plaintiff to FMC's website, fundmycontract.com, and fill out another loan application.

92. FMC is a multi-lender platform that gives "coaching" scams the ability to offer high-interest loans to consumers who would not otherwise have the ability or willingness to put the high-ticket course fees on their credit cards or debit cards.

93. FMC's platform also gives "coaching" scams the ability to charge fees in multi-five figure sums that exceed the limits on most consumers' credit cards.

94. FMC states on its website that it is "a community of merchants and lenders focused on creating shared value;" and that it has "established long-standing relationships with a network of trusted lenders dedicated to helping your clients access the financing they need to enroll in your coaching or training course."

95. FMC also offers "training" to its "coaching" customers on point-of-sale financing business, which is mentioned on its website where it invites "coaches" to "apply" with FMC.

96. Thread is one of several banks that can approve consumers through the website fundmycontract.com operated by FMC.

97. Plaintiff filled in her information as instructed by Growth Cave and Pulliam, using the income figure of $95,000 that Pulliam and Growth Cave instructed her to use, and she was approved for a personal consumer loan with Thread.

98. Pulliam rushed Plaintiff through the loan application to get her to sign without time to read or consider the loan.

99. Sadly, Pulliam is a lawyer admitted to the Georgia bar in 2001.

100. Thread, like Wizebank, offers point-of-sale loans to the "coaching" industry.

101. The Thread contract failed to include required Holder Rule language.

102. The Thread contract provides various rights to holders and assignees to robo-call and engage in collection, but the Thread contract expressly disclaims any Holder Rule remedies, stating in pertinent part:

> Dissatisfaction with Merchant – Except as otherwise provided herein, if I am dissatisfied with the Merchant, I am not relieved of any obligation on my Loan. I understand and acknowledge that Lender,

its employees and agents, do not in any way endorse, promote or make any representations regarding the quality of any Merchant.

103. The Thread loan contract states that it is for "personal, household, or family purposes" for "Growth Cave."

104. Plaintiff was approved for a 60-month loan with Thread at 19.99% APR.

105. Plaintiff will end up paying $59,994.84 over the life of the Thread loan if she does not repay early.

106. Plaintiff was obligated to repay Thread and the $10,000 down payment on her American Express credit card before Plaintiff ever had the opportunity to review the "take it or leave it" contract Growth Cave required Plaintiff to sign weeks later at the "Mastermind" event.

107. Plaintiff has made no money from the Growth Cave/Lee-Tyson/Batte pseudo-"coaching."

108. Plaintiff still owes $9,046 on her American Express credit card, and over time making the minimum payments she will end up paying $28,991.

109. Soon thereafter, FinMkt performed a hard credit inquiry on Plaintiff's credit files.

110. And, right after Thread originated the loan, Thread sold it to US Credit, not a party to this action.

111. US Credit recently filed for bankruptcy under Chapter 11 U.S.C.

112. At the time of origination, Plaintiff was presented with, and required to sign, an ACH agreement with UGA permitting UGA, the loan servicer, to automatically charge monthly loan payments to Plaintiff's credit card.

113. The charges appeared not as Thread, but as "Growth Cave" on statements.

114. Plaintiff did not know that Growth Cave's term was "no refunds" until long

after Growth Cave had already been paid by Defendants.

115. Defendants never provided Plaintiff with a receipt, except a paragraph in its contract referencing "DVDs" and "CDs" which were never provided.

116. Plaintiff was granted "access" to Growth Cave's, Lee-Tyson's, and Batte's "portal" and "materials" consisting of nothing more than prerecorded videos, a few Google Documents, and a generic "virtual sales letter" template for Plaintiff to fill in to create her own "online course."

117. Plaintiff quickly realized that using Growth Cave's methods and sales scripts consisted of coaching one's own customers to also use misleading language and false representations when marketing one's own online courses to the public.

118. Plaintiff informed Growth Cave of the impossibility of her using the misleading sales scripts and methods via a Slack message.

119. Growth Cave had no meaningful response for Plaintiff, and shortly thereafter stopped providing all its customers access to Growth Cave via Slack.

120. Very soon into the period of promised "services," Growth Cave reneged on its inflated promises of "coaching" and "done for you" services it had promised to Plaintiff.

121. Growth Cave ceased providing many promised services and features, including a community support forum, one-on-one "coaching" sessions, videos, "automation," and setting up the online sales system.

122. Upon entering Growth Cave's "Mastermind," which had been represented as limited to 25 participants, Plaintiff discovered that there were over 100 victims of Growth Cave in the program, many of whom were also in significant debt with lenders like Thread and Wizebank, and who were also

not making any money using Growth Cave's, Lee-Tyson's, and Batte's methods and sales scripts in their online courses.

123. Plaintiff received only one personal "coaching" call with Lee-Tyson, who gave Plaintiff a pep-talk devoid of strategy, similar to his free content on YouTube.

124. Lee-Tyson summarily claimed that Plaintiff's online course would make money without instructing Plaintiff on a lawful way to do so.

125. This "exclusive," "personal" help that was promised to Plaintiff was nothing more than 30 minutes of rehashing the misleading "think and grow rich" kind of pep talk that Growth Cave and Lee-Tyson use in their videos, plus unethical marketing advice, and stringing Plaintiff along.

126. Plaintiff scheduled a "mindset coaching" call with Batte, but he failed to appear at the appointed time.

127. Plaintiff rescheduled, and Batte showed up the second time.

128. Batte's "mindset coaching" consisted of unlicensed financial advice, instructing Plaintiff that Plaintiff should sell a course to consumers that instructs consumers to "take out all the equity in their homes because of the looming recession."

129. Plaintiff believes that Batte's "advice" was intended to make Plaintiff's potential customers free up cash so that *Plaintiff's* potential customers could pay for overpriced "coaching" programs in lieu of building equity in their homes and buy worthless "coaching" programs, thus passing along the fraud and deception to other consumers.

130. Plaintiff's third and final call was with Jordan Marksberry, a Growth Cave "Operations Tech," who informed Plaintiff that she would need to set up her

own "sales funnel."

131. Marksberry informed Plaintiff that she would need to use Growth Cave's software "Growthbox.ai," which is a separate purchase on a monthly subscription format in order to automate emails and schedule sales calls, and that Plaintiff would need to set this up herself.

132. Plaintiff was also required to purchase a significant amount of equipment to do the tasks that Growth Cave did not "do for [her]," including a microphone, ring light, and phone tripod.

133. Plaintiff realized that the "done for you" program she paid $40,000 to join was not "done for [her]" at all.

134. Plaintiff was required to record her own videos, using scripts written by Growth Cave, that Plaintiff had to significantly re-write because Growth Cave's representations were unethical and would expose her to liability if she used them.

135. Plaintiff confronted Growth Cave and Thread about these issues via email, but was dismissed.

136. When Plaintiff lodged a dispute with Thread to try to cancel the loan and the monthly payments, Thread transferred Plaintiff to US Credit.

137. In response to Plaintiff's complaint to the FDIC about Thread, Thread made the unfounded claim that Growth Cave is "not a seller" pursuant to the Holder Rule.

138. The Thread loan agreement contained standard disclosures that identified the "lender" as Thread, the "merchant" as Growth Cave, and the servicer as UGA.

139. In a response dated October 3, 2023 to Plaintiff's complaint to the FDIC, however, Thread claimed that the Holder in Due Course rule "does not apply

to this lending model" and "the merchant, in this case, Growth Cave, does not satisfy the definition of a seller under the rule, and this is not an indirect lending product."

140. Under this "lending model," even if consumers default on these loans, Defendants have all already profited handsomely through the collection of the down payment and as many monthly payments the consumer makes before realizing they have been scammed.

141. In response to Plaintiff's disputes to US Credit, US Credit stated that the response from *FinMkt* was that Plaintiff's only recourse was to speak with Growth Cave's attorney.

142. US Credit also explained to Plaintiff that FinMkt was the "funds processor" for Growth Cave.

143. FinMkt, as the arranger of credit, funds processor and user that performs the hard inquiry into consumers' credit files, is knowledgeable and well-known in the coaching and course marketing industry and is aware of the problems endemic to many persons and entities who market themselves as "coaches."

144. FMC, who works closely with FinMkt, is also knowledgeable and well-known in the coaching and course marketing industry and is aware of the problems endemic to many persons and entities who market themselves as "coaches."

145. Wizebank continues to work closely with Growth Cave, is knowledgeable and well-known in the coaching and course marketing industry, and is aware of the problems endemic to many persons and entities who market themselves as "coaches," including Growth Cave, Lee-Tyson and Batte.

146. US Credit later informed Plaintiff that due to the number of complaints about Growth Cave, that US Credit was no longer working with Growth Cave.

147. Plaintiff also attempted to dispute through the UGA consumer website.

148. UGA has encountered issues like Growth Cave before; UGA is subject to a stipulated order and permanent injunction in *Federal Trade Commission v. Universal Guardian Acceptance, LLC, a limited liability company and Universal Account Servicing, LLC, a limited liability company,* 2:21-cv-8260-JVS-KES, Dkt. 15 (C.D. Cal., October 22, 2021) ("*FTC v. UGA* Order").

149. The *FTC v. UGA* Order permanently enjoined UGA from:

> …providing substantial assistance or support (including underwriting, funding, or servicing of Accounts) to any Person that they know or should know is engaged in:
>
> A. Making false, unsubstantiated, or otherwise misleading Earnings Claims;
>
> B. Failing to Clearly and Conspicuously disclose all goods and services that are sold in conjunction with the offered good or service, and the total cost to purchase, receive, or use, any goods or services that are the subject of the sales offer;
>
> C. Failing to Clearly and Conspicuously disclose all material terms and conditions of an offer;
>
> D. Misrepresenting directly or by implication, any material aspect of the performance, efficacy, nature, or central characteristics of any goods or services; or
>
> E. Misrepresenting, directly or by implication, any material aspect of the nature or terms of any refund, cancellation, exchange, or repurchase policies.

150. US Credit, UGA, Thread and FinMkt have all been unwilling to provide any relief to Plaintiff.

151. Plaintiff had placed the $10,000 down payment on her credit card with American Express (not a party to this action) and repeatedly disputed the charge as fraud to American Express, detailing the many false promises made.

152. American Express notified Growth Cave of Plaintiff's disputes, and Growth Cave responded that because Plaintiff had "accessed" the "course," that it would not reverse the charge, in essence claiming that Plaintiff had paid $40,000 for a few videos and having to do everything on her own instead of the promised "done for you."

153. The cost of Plaintiff's having been defrauded by Growth Cave will be $91,000 over the life of the debts.

154. Plaintiff has been unable to stop the monthly payments on the loans despite her protests and revocation of authorization to Defendants.

155. The loan payments keep posting.

156. Growth Cave, Lee-Tyson and Batte continue to advertise on social media, and heavily on YouTube.

157. Wizebank continues to promote Growth Cave as one of its "partners."

158. FinMkt has stopped working with Growth Cave, but disclaims any authority to provide Plaintiff any relief.

159. UGA continues to service a loan for a "coaching" program that is disturbingly similar to the issues that led to the permanent injunction against it in case number 2:21-cv-08260-JVS-KES in this Court.

160. Defendants continue to hold Plaintiff responsible for fraudulent debts for illusory services, and disclaim authority to remedy the issue, despite each of their roles being carefully orchestrated at the point of sale.

///

## CAUSE OF ACTION CLAIMED BY PLAINTIFF
## COUNT I

**VIOLATION OF THE FAIR CREDIT REPORTING ACT – AS TO FINMKT &
WIZEBANK**

### 15 U.S.C. §1681 ET SEQ.

161. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

162. The foregoing acts and omissions constitute numerous and multiple violations of the FCRA.

163. The FCRA was created to "ensure fair and accurate credit reporting, promote efficiency, and protect consumer privacy." *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 52 (2007).

164. FinMkt and Wizebank view the credit files of consumers, including Plaintiff's credit files, and is therefore a "user" subject to the FCRA.

165. Plaintiff is therefore a "consumer" as defined by the FCRA, 15 U.S.C. §1681a(c), and Plaintiff acted as a "consumer" at all times relevant to this litigation.

166. FinMkt and Wizebank are required to establish reasonable procedures that would prevent their facilities from being used to obtain a consumer report under false pretenses and as specifically authorized, pursuant to 15 U.S.C. §1681b(f).

167. FinMkt and Wizebank and their respective employees are prohibited from obtaining a consumer report under false pretenses, pursuant to 15 U.S.C. §1681q.

168. FinMkt and Wizebank, as detailed above, market their services to "coaches" it knows are engaged in price gouging and/or false promises.

169. FinMkt and Wizebank are intimately familiar with the coaching industry and the practices of "coaching" scams.

170. FinMkt, as the credit arranger behind FMC, a stated "lending partner" of Growth Cave, is intimately familiar with Growth Cave's illusory product, false and misleading marketing, false and misleading social media marketing, false claims, activities, and treatment of consumers.

171. FinMkt, therefore, knows that by arranging credit for Growth Cave and processing payments, it is facilitating a coaching scam.

172. FinMkt arranges the loans for Growth Cave and other such "coaches."

173. FinMkt is the "funds processor" for consumers' monthly payments to Growth Cave and other such coaching scams.

174. Wizebank, as a lender that specializes in "coaches" and that continues to publicly partner with Growth Cave, is intimately familiar with Growth Cave's illusory product, false and misleading marketing, false and misleading social media marketing, false claims, activities, and treatment of consumers.

175. Wizebank, therefore, knows that by lending to Growth Cave's customers, Wizebank is facilitating a coaching scam.

176. As detailed above, the financing for Growth Cave facilitates the coaching scam.

177. FinMkt and Wizebank obtained Plaintiff's credit files to facilitate the Growth Cave scam.

178. FinMkt and Wizebank are also in receipt of consumer complaints about Growth Cave, but thereafter continued to participate in the lending/funding scheme that makes Growth Cave's predatory programs possible.

PLAINTIFF'S COMPLAINT          23

179. FinMkt and Wizebank continued to permit their respective facilities to be used to obtain credit reports on consumers to facilitate victimization of consumers by the Growth Cave coaching scam.

180. Wizebank continues to work with Growth Cave to this day.

181. FinMkt and Wizebank, therefore, failed to establish reasonable procedures to prevent their facilities from being used to obtain a consumer report under false pretenses and as specifically authorized, pursuant to 15 U.S.C. §1681b(f).

182. As a result of FinMkt and Wizebank, Plaintiff suffered damage, and continues to suffer actual damages, including economic loss, damage to reputation, emotional distress and interference with her normal and usual activities for which she seeks damages in an amount to be determined by the jury.

183. FinMkt's and Wizebank's actions were willful pursuant to 15 U.S.C. §1681n.

184. FinMkt's and Wizebank's actions were done under false pretenses pursuant to 15 U.S.C. §1681q.

185. In the alternative, FinMkt's and Wizebank's conduct, action, and inaction were willful, rendering Defendant liable to Plaintiff for punitive damages pursuant to 15 U.S.C. §1681n.

186. In the alternative, FinMkt and Wizebank were each negligent, thereby entitling Plaintiff to recover damages under 15 U.S.C. §1681o.

187. Plaintiff is entitled to recover costs and attorneys' fees from FinMkt and Wizebank pursuant to 15 U.S.C. §1681.

## COUNT II

### FRAUD

188. Plaintiff incorporates by reference all of the above paragraphs of this

Complaint as though fully stated herein.

189. The foregoing acts and omissions constitute numerous and multiple violations of Fraud.

190. Defendants Growth Cave, Lee-Tyson and Batte, with fraudulent intent, sold Plaintiff an illusory product/service at double-digit interest rates for tens of thousands of dollars.

191. Growth Cave, Lee-Tyson and Batte used bait-and-switch sales and marketing tactics, false guarantees and promises of specific services that were never provided.

192. Growth Cave manipulated Plaintiff's trust and instructed Plaintiff to submit a false income figure in a loan application.

193. Growth Cave's, Lee-Tyson's and Batte's marketing representations regarding "$10,000 month guarantees," "loophole in the YouTube algorithm," "Done for you," make money on YouTube "without making videos," the method and script for sales and marketing, and the design of the scheme are fraudulent.

194. FinMkt, FMC's, and Wizebank's platforms and systems to make thousands of dollars of high-interest credit readily available to merchants in an industry rife with scams, and their coaching of "high-ticket business coaches" on how to convince consumers to take out such high-interest loans generally, and their "partnering" and aiding of Growth Cave in particular, constitute fraud and a furtherance of Growth Cave's unlawful activities.

195. Growth Cave, Lee-Tyson and Batte deliberately withheld material facts about the nature of their "coaching" program, including the fact that success in the program was contingent on Plaintiff's being willing to follow

instructions to lie in her own marketing to consumers.

196. Defendants Growth Cave, Lee-Tyson and Batte represented that the income guarantee, Youtube "loophole," the list of "done for you" services, that Plaintiff could make money on YouTube "without making videos," the method and script for sales and marketing were all true.

197. The income guarantee, Youtube "loophole," the list of "done for you" services, that Plaintiff could make money on YouTube "without making videos," the method and script for sales and marketing were all false.

198. Thread, Wizebank and UGA are liable for the fraud violations of Growth Cave, Lee-Tyson and Batte pursuant to the Holder in Due Course rule.

199. Thread's and Wizebank's knowing origination of loans for "coaching" scams generally, and Growth Cave in particular, and facilitating the deception of Growth Cave in particular, constitute fraud.

200. And by servicing loans for Growth Cave, just as UGA has facilitated loans for others who have made false and unsubstantiated claims to sell training programs, UGA is facilitating the deception of Growth Cave, furthering Growth Cave's unlawful activities.

201. Defendants intended for Plaintiff to rely on all those representations and promises.

202. Plaintiff reasonably relied on Defendants' representations.

203. The fraudulent representations designed to induce Plaintiff into spending $49,800 with Defendants, that between credit card interest and interest on the Thread loan, will exceed $91,000 if she is not able to pay off the obligations early.

204. The fraud caused Plaintiff to sustain injury, damage, loss and harm.

205. In pursuing Defendants' unlawful coaching scam against Plaintiff, Defendants are guilty of oppression, fraud and malice as defined by Cal. Civ. Code §3294(c)(1) – (3).

### COUNT III

### FALSE PROMISES

206. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

207. The foregoing acts and omissions constitute numerous and multiple violations of False Promises.

208. Growth Cave, Lee-Tyson and Batte had no intention of performing their promises of $10,000 monthly profits, disclosing the purported Youtube "loophole," the list of "done for you" services, or that Plaintiff could make money on YouTube "without making videos," or the amount of one-on-one "coaching" promised at the time Growth Cave, Lee-Tyson and Batte made these promises.

209. Growth Cave, Lee-Tyson and Batte intended that Plaintiff rely on these promises.

210. Plaintiff reasonably relied on Growth Cave's, Lee-Tyson's and Batte's promises.

211. Growth Cave, Lee-Tyson and Batte did not perform the promised acts.

212. The false promises of Growth Cave, Lee-Tyson and Batte caused Plaintiff to sustain injury, damage, loss and harm.

213. Plaintiff's reliance on the promises of Growth Cave, Lee-Tyson and Batte was a substantial factor in causing Plaintiff's injury, damage, loss and harm.

214. Thread, UGA and Wizebank are liable for the false promises of Growth

Cave, Lee-Tyson and Batte pursuant to the Holder in Due Course rule.

215. Thread's and Wizebank's knowing origination of loans for "coaching" scams generally, and Growth Cave in particular, and facilitating the unawlful activities of Growth Cave, constitute false promises.

216. And by servicing loans for Growth Cave, just as UGA has facilitated loans for others who have made false and unsubstantiated claims to sell training programs, UGA is facilitating the deception of Growth Cave, furthering Growth Cave's unlawful activities.

217. FinMkt, FMC's, and Wizebank's platforms and systems to make thousands of dollars of high-interest credit readily available to merchants in an industry rife with scams, and their coaching of "high-ticket business coaches" on how to convince consumers to take out such high-interest loans, and their "partnering" and aiding of Growth Cave in particular, constitute false promises.

218. Defendants intended for Plaintiff to rely on all their false promises.

219. Plaintiff reasonably relied on Defendants' false promises.

220. The false promises designed to induce Plaintiff into spending $49,800 with Defendants, that between credit card interest and interest on the Thread loan, will exceed $91,000 if she is not able to pay off the obligations early.

221. The false promises caused Plaintiff to sustain injury, damage, loss and harm.

222. In pursuing Defendants' unlawful coaching scam against Plaintiff, Defendants are guilty of oppression, fraud and malice as defined by Cal. Civ. Code §3294(c)(1) – (3).

///

///

## COUNT IV

### NEGLIGENT MISREPRESENTATION

223. Plaintiff incorporates by reference all of the above paragraphs of this Complaint as though fully stated herein.

224. The foregoing acts and omissions constitute numerous and multiple violations of Negligent Misrepresentation.

225. Growth Cave, Lee-Tyson and Batte represented that the following were true: $10,000 monthly profits, a Youtube "loophole," the list of "done for you" services, that Plaintiff could make money on YouTube "without making videos," the amount of one-on-one "coaching," the exclusivity and limit to the number of people in the DFM program, among other representations.

226. Although Growth Cave, Lee-Tyson and Batte may have honestly believed that the representations were true, Growth Cave, Lee-Tyson and Batte had no reasonable grounds for believing the representations were true when they made them.

227. Growth Cave, Lee-Tyson and Batte intended that Plaintiff rely on these representations.

228. Plaintiff, who was not experienced in online marketing, reasonably relied on the representations of Growth Cave, Lee-Tyson and Batte.

229. The misrepresentations of Growth Cave, Lee-Tyson and Batte caused Plaintiff to sustain injury, damage, loss and harm.

230. Plaintiff's reliance on the representations of Growth Cave, Lee-Tyson and Batte was a substantial factor in causing Plaintiff's injury, damage, loss and harm.

231. Thread, UGA and Wizebank are liable for the negligent representations of

Growth Cave, Lee-Tyson and Batte pursuant to the Holder in Due Course rule.

232. Thread's and Wizebank's origination of loans for "coaching" scams generally and for Growth Cave in particular constitute negligent misrepresentations made upon no reasonable grounds for belief the programs were legitimate.

233. Given previous allegations against UGA pertaining to servicing loans for companies alleged to have used unsubstantiated earning claims and deception to sell training programs, UGA's servicing of loans for Growth Cave constitutes negligent misrepresentations made upon no reasonable grounds for belief that the Growth Cave programs were legitimate.

234. FinMkt, FMC's, and Wizebank's platforms and systems to make thousands of dollars of high-interest credit readily available to merchants in an industry rife with scams, and their coaching of "high-ticket business coaches" on how to convince consumers to take out such high-interest loans, and their "partnering" and aiding of Growth Cave in particular, are negligent misrepresentations made upon no reasonable grounds for belief that the Growth Cave programs were legitimate.

235. Defendants intended for Plaintiff to rely on all their representations.

236. Plaintiff reasonably relied on Defendants' representations.

237. The fraudulent representations designed to induce Plaintiff into spending $49,800 with Defendants, that between credit card interest and interest on the Thread loan, will exceed $91,000 if she is not able to pay off the obligations early.

238. The negligent misrepresentations caused Plaintiff to sustain injury, damage,

loss and harm.

239. In pursuing Defendants' unlawful coaching scam against Plaintiff, Defendants are guilty of oppression, fraud and malice as defined by Cal. Civ. Code §3294(c)(1) – (3).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered against Defendants for:

- An award of actual damages, in an amount to be determined at trial, pursuant to 15 U.S.C. §§ 1681 (against FinMkt and Wizebank);
- An award of actual damages, in an amount to be determined at trial, against each named Defendant individually;
- An award of costs of litigation and reasonable attorney's fees, pursuant 15 U.S.C. §1681 (against FinMkt and Wizebank);
- Any and all other relief that this Court deems just and proper.

## TRIAL BY JURY

240. Pursuant to the seventh amendment to the Constitution of the United States of America, Plaintiff is entitled to, and demands, a trial by jury.

Date: February 20, 2024

By:  S//Matthew Loker
MATTHEW LOKER
ATTORNEY FOR PLAINTIFF

By:  S//SaraEllen Hutchison
SARAELLEN HUTCHISON
(PRO HAC VICE TO BE REQUESTED)
ATTORNEY FOR PLAINTIFF